THE DOW CHEMICAL COMPANY vs. COMMISSIONER OF
REVENUE.

Suffolk. March 7, 1979. — June 13, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Taxation*, Corporate excise, Income of controlled foreign subsidiaries.

Discussion of the Massachusetts corporate excise tax provisions. [258-
261]
Description of the "Subpart F income" provisions of the Internal Reve-
nue Code. [261-264]
A corporation's Subpart F income, as defined in § 952 of the Internal
Revenue Code, must be included in gross income for Massachusetts
corporate excise tax purposes under the provisions of G. L. c. 63,
§ 30 (5) (a). [264-267]
Dividends deductible under G. L. c. 63, § 38, are not limited to divi-
dends of domestic corporations. [267-269]
A corporation's Subpart F income, as defined in § 952 of the Internal
Revenue Code, is a dividend deductible under G. L. c. 63, § 38 (a) (1).
[269-272]
Description of the "foreign tax gross-up" provisions of the Internal
Revenue Code. [273-275]
A corporation's foreign tax gross-up, as defined in § 960 of the Internal
Revenue Code, is deductible as a dividend under the provisions of
G. L. c. 63, § 38 (a) (1). [275-279]
The dividend deduction of G. L. c. 63, § 38 (a) (1), is confined to divi-
dends included in taxable net income for the year in which the
deduction is claimed, and, therefore, a corporation was not entitled
to a deduction for dividends previously included in Subpart F in-
come, as defined in § 952 of the Internal Revenue Code, but actually
received during the tax year. [280]

APPEAL from a decision of the Appellate Tax Board.

*Chester M. Howe* (*Maxwell D. Solet* with him) for the taxpayer.

*John E. Bowman, Jr.*, Assistant Attorney General (*S. Stephen Rosenfeld*, Assistant Attorney General, with him) for the State Tax Commission.

*John S. Brown & Debra L. Lay-Renkens* for Polaroid Corporation, amicus curiae, submitted a brief.

KAPLAN, J. The Dow Chemical Company, a Delaware corporation conducting business in the Commonwealth, contends that the Commissioner of Revenue, in calculating the taxable net income of the corporation for the year 1969 for purposes of the corporate excise, unlawfully included therein certain items deriving from income of controlled foreign[1] subsidiaries. This resulted in an assessment of additional tax which Dow seeks to recover by the present appeal.

I. *Statement.* The facts are stipulated. Dow, with its principal place of business in Midland, Michigan, is engaged in the manufacture and sale of chemicals, metals, plastics, and consumer products in the United States and abroad. It conducts its foreign business through a number of subsidiary corporations incorporated and doing business in Canada, Latin America, Europe, Africa, and the Pacific area. Reflecting these foreign activities, Dow included in gross income on its Federal income tax return for the taxable year ended December 31, 1969, the first two items which, in their bearing on the State tax, are the subject of the present dispute.

The first, in an amount of $8,539,158, represented Dow's "Subpart F income" as defined in § 952 of the Internal Revenue Code. Subpart F income, to be discussed in detail below, may be epitomized as income of certain types earned by a domestic corporation's foreign subsidiaries in a given taxable year, although not necessarily

---

[1] Unless otherwise noted, we use the word "foreign" to refer to foreign countries, not States other than Massachusetts.

distributed to its shareholders in that year. Dividend distributions in the amount of $6,610,418 were actually received by Dow from its foreign subsidiaries in 1969 but, under Code § 959(a), were excluded from the Federal gross income reported for 1969 because they were comprised in the $8,539,158 of Subpart F income earned and reported for 1969. Additional dividends totaling $3,740,-485 were received in 1969 and were also excluded because they had been comprised in Subpart F income earned and reported in years preceding 1969.

Second, Dow included in Federal gross income an amount of $411,256 under Code § 78, representing the foreign taxes paid or deemed paid by its subsidiaries on Subpart F income. This "foreign tax gross-up" is included in gross income in order to ensure proper calculation of the foreign tax credit.

It is agreed that Dow's treatment of both Subpart F income and foreign tax gross-up was appropriate under the Federal Code.

Dow has been qualified to do business in the Commonwealth since 1947. In the taxable year 1969, it had Massachusetts sales of $36,616,802; its ninety-three Massachusetts employees received $1,136,034 in salaries or other compensation; and it owned real and tangible personal property in the Commonwealth of a value of $2,410,588.

On its 1969 State corporate excise return, filed on October 15, 1970, Dow included Subpart F income and foreign tax gross-up in gross income, just as it had on its corresponding Federal return. At the same time it deducted both items as dividends pursuant to G. L. c. 63, § 38 (a) (1). Purporting to act under the same provision, it deducted a third item, the $3,740,485 representing dividends actually received in 1969 but earned and included in Subpart F income reported in the Commonwealth in previous years.

In 1973 the Department of Corporations and Taxation assessed Dow an additional $13,983.87 of tax: $10,873.72

represented the increase of tax caused by disallowance of the three claimed deductions, and the remainder was interest on that increment. Dow paid the assessment and then applied to the State Tax Commission (now designated the Commissioner of Revenue, St. 1978, c. 514) for an abatement in the same amount. The application was denied on June 13, 1975. Dow filed a timely appeal to the Appellate Tax Board which, without opinion, affirmed the decision of the Commission. Dow appeals to this court.

II. *Summary of conclusions.* We reverse in part and affirm in part. Although both Subpart F income and foreign tax gross-up were properly included in Massachusetts gross income, they were deductible as dividends under G. L. c. 63, § 38 (a) (1). However, the claimed deduction for dividends actually received in 1969 was properly disallowed.

We reason as follows. The corporate excise adopts the Federal definition of gross income but, to determine taxable net income, allows a deduction for "dividends" included in net income in the taxable year. Subpart F income is included in Federal gross income; and there is no obstacle to the Legislature's treating the earned income of a foreign corporation as income taxable to its domestic parent, even if the parent chooses not to have that income distributed in the taxable year. Subpart F income must therefore be included in Massachusetts gross income. But that income is included in gross income only because it is treated federally as if it had been currently distributed; it should be similarly treated under State law and deductible as a dividend. Disallowance of a dividend deduction for undistributed Subpart F income would in fact prevent the taxpayer from ever receiving a deduction for that income since it could not be included in income when actually distributed; the disallowance would thus subvert the statutory purpose of preventing multiple taxation of corporate income.

The foreign tax gross-up on Subpart F income represents no gain to the taxpayer; it is a fictional Federal

addition to gross income designed to help compute the
Federal foreign tax credit. But its Federal treatment as
a dividend included in income carries over to the State
law, so that it should be included in gross income for the
State purpose and deducted as a dividend.

Finally, dividends actually received in the taxable year
but comprised in Subpart F income in previous years may
not be deducted. Inclusion in net income in the taxable
year, as noted above, is a prerequisite for the dividend
deduction.

III. *Discussion.* This case involves the interaction of
three statutory schemes: the Massachusetts corporate ex-
cise, G. L. c. 63, §§ 30-52; the Subpart F provisions of the
Code, §§ 951-964; and the provisions relating to the for-
eign tax credit, Code §§ 78, 901-908, 960. Exposition is
necessarily lengthy although the principles guiding deci-
sion are not complicated.

A. *The corporate excise.* By St. 1966, c. 698, our corpo-
rate excise was substantially rewritten to provide new
methods of determining taxable net income and appor-
tioning that income to Massachusetts.[2] The income com-
ponent of the excise is determined by calculating gross
income, applying certain deductions, allocating the re-
sulting figure to Massachusetts through an apportion-
ment formula, and multiplying the product by a percent-
age specified in G. L. c. 63, § 39. Gross income for the
excise is "gross income as defined under the provisions of
the Federal Internal Revenue Code, as amended and in
effect for the taxable year" (with exceptions not relevant
here). G. L. c. 63, § 30 (5) (*a*). Net income is obtained by
subtracting from gross income the deductions allowed by
the Federal Code, except that the Federal deduction for
dividends received (confined to 85% of dividends received
from domestic corporations, Code § 243) is not taken over

[2] See generally Dane, Taxation of Corporations and Banks: 1966
Legislation, 52 Mass. L.Q. 41 (1967); 1966 Ann. Survey Mass. Law
319-322.

as such in the State law; nor are the Federal deductions for losses sustained in other years, or for taxes imposed by other States or foreign countries allowed by the State law. The State law does not allow the credits permitted by the Federal Code; this applies to the foreign tax credit as described in Code §§ 901, 902, and 960.

To determine State taxable net income, however, certain additional deductions are permitted by the State law. Dividends may be deducted if they were included in net income under the scheme described above, G. L. c. 63, § 38 (a) (1) — this deduction is not confined under Code § 243.[3]

The taxable net income thus finally attained is apportioned to Massachusetts through use of a commonly adopted[4] formula measuring the taxpayer's values in the Commonwealth in relation to its values world-wide. Some such apportionment is constitutionally required in order that "the income attributed to the State for tax purposes . . . be rationally related to 'values connected with the taxing State.' " *Moorman Mfg. Co.* v. *Bair*, 437 U.S. 267, 273 (1978), quoting from *Norfolk & W.R.R.* v. *State Tax Comm'n*, 390 U.S. 317, 325 (1967). See *State Tax Comm'n* v. *John H. Breck, Inc.*, 336 Mass. 277 (1957).[5] Under G. L.

---

[3] In 1974 the dividend deduction was limited to corporations owning at least 15% of the voting stock of the relevant corporation. See St. 1974, c. 722, § 1.

[4] See Uniform Division of Income for Tax Purposes Act §§ 9-13, 7A U.L.A., 91, 100-103 (1978); Note, 8 B.C. Indus. & Com. L. Rev. 114, 117 (1967).

The rationale for the requirement that corporate taxpayers shall include the full amount of their taxable net income in their State return, and then allocate a suitable portion to the State, is that "the realistic value of the exercise of a franchise in a particular state is enhanced and contributed to by the worth or income of the entire enterprise everywhere." *F. W. Woolworth Co.* v. *Director of Div. of Taxation*, 45 N.J. 466, 481 (1965). See *State Tax Comm'n* v. *John H. Breck, Inc.*, 336 Mass. 277 (1957).

[5] See *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell*, 283 U.S. 123 (1931), and generally, C.T. Allman & F.M. Keesley, Allocation of Income in State Taxation (1946); Corrigan, Interstate Corporate In-

c. 63, § 38, taxable net income is multiplied by the average of fractions representing (i) the corporation's total sales within the State divided by its total sales worldwide; (ii) the value of the corporation's real and tangible personal property owned, rented, or used in the Commonwealth divided by the value of its like world-wide property; and (iii) the amount of compensation paid in the Commonwealth divided by the amount paid world-wide. If in a particular case these "allocation and apportionment provisions . . . are not reasonably adapted to approximate the net income derived from business carried on within the Commonwealth," the taxpayer may proceed under G. L. c. 63, § 42, to attempt to use another method shown to be more reasonable. See *Becton, Dickinson & Co.* v. *State Tax Comm'n*, 374 Mass. 230 (1978).

To return to the current facts: After deducting Subpart F income, foreign tax gross-up, and the dividends actually received but contained in Subpart F income in previous years, Dow computed its taxable net income for 1969 as $105,575,996. Dow's business activities in the Commonwealth accounted for about 2.5070% of its total sales, 0.1914% of its total real and tangible personal property, and 0.3093% of its total payroll. (Here no account was taken of the sales, property, or payroll of Dow's foreign subsidiaries.) The average of the three percentages is 1.00255%, which, applied to Dow's taxable net income, yielded $1,058,448. An additional extraneous deduction resulted in a final figure of $942,104, producing a tax liability of $80,550. Disallowance of the three claimed deductions increased taxable net income allocated to the Commonwealth by $127,178 and tax liability, as noted above, by $10,873.72.

come Taxation — Recent Revolutions and a Modern Response, 29 Vand. L. Rev. 423 (1976); Dexter, Taxation of Income from Intangibles of Multistate-Multinational Corporations, 29 Vand. L. Rev. 401 (1976); Silverstein, Problems of Apportionment in Taxation of Multistate Business, 4 Tax L. Rev. 207 (1949).

The present controversy turns primarily on the treatment of Subpart F income and foreign tax gross-up. The Commissioner characterized both as income includible under § 30 (5) (a) but as not dividends deductible under § 38 (a) (1). Dow disputes both characterizations, and we consider these matters below. Our conclusions thereon relieve us of having to deal with Dow's alternative contention that if the Commissioner's views were accepted, the assessment would not properly measure income derived from business in the Commonwealth, with consequent violations of the apportionment requirements of G. L. c. 63, § 42, and the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and analogous provisions of the Massachusetts Declaration of Rights.[6]

B. *Subpart F income.* (1) *Description.* Before the enactment of the Subpart F provisions of the Code, the income of foreign corporations controlled by American corporations was subject to taxation in the United States only when it was returned — or "repatriated" — in the form of dividends. For this reason domestic corporations found it advantageous to conduct foreign activities through subsidiaries rather than through branch offices whose income was taxed as earned: thereby payment of domestic tax could be deferred until the shareholders controlling the subsidiaries found it expedient to repatriate. A large number of "enterprises organized abroad by American firms . . . arranged their corporate structures — aided by artificial arrangements between parent and subsidiary regarding intercompany pricing, the transfer of patent licensing rights, the shifting of management fees, and

---

[6] On the alternative contention, see our mention below of the Vermont situation with respect to the gross-up: *In re Goodyear Tire & Rubber Co.*, 133 Vt. 132 (1975); *F. W. Woolworth Co.* v. *Commissioner of Taxes*, 130 Vt. 544 (1972). See also *Mobil Oil Corp.* v. *Commissioner of Taxes*, 136 Vt. 545 (1978), prob. juris. noted, 441 U.S. 941 (1979); *F. W. Woolworth Co.* v. *Director of the Div. of Taxation*, 45 N.J. 466 (1965). Cf. *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U.S. 434 (1979).

similar practices which maximize the accumulation of profits in the tax haven — so as to exploit the multiplicity of foreign tax systems and international agreements in order to reduce sharply or eliminate completely their tax liabilities both at home and abroad." H.R. Rep. No. 1447 to H.R. 10650, 87th Cong., 2d Sess. 57 (1962) (quoting from 1961 tax message of President Kennedy).

To meet the perceived problem of deferral of domestic tax through foreign corporate "tax havens,"[7] Congress in 1962 enacted §§ 951-964 of the Code. By these provisions specified categories of income of foreign corporations must be included in the gross income of their American shareholders (individual or corporate) in the taxable year in which the income is earned without regard to whether it is then distributed: it is "deemed" distributed even if in fact retained abroad.

"[T]he rules of Subpart F reach and never leave a lofty plateau of complexity that the Internal Revenue Code had previously attained only in occasional subsections." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders par. 17.31 (1971). We provide a bare summary.[8] Subpart F applies to "controlled" foreign corporations, defined in § 957 as those, 50% or more of whose voting power is owned by United States shareholders. Any United States shareholder owning 10% or

---

[7] For discussion, see B. Bittker & L. Ebb, United States Taxation of Foreign Income and Foreign Persons 338-348 (1968), and sources cited at 338 n. *; H.R. Rep. No. 1447 to H.R. 10650, 87th Cong., 2d Sess. 57-66 (1962); S. Rep. No. 1881 to H.R. 10650, 87th Cong., 2d Sess. 78-94 (1962). See generally Park, Fiscal Jurisdiction and Accrual Basis Taxation: Lifting the Corporate Veil to Tax Foreign Company Profits, 78 Colum. L. Rev. 1609 (1978).

Although the United States was the first country to tax undistributed foreign subsidiary income, similar systems have been enacted in Canada, West Germany, and Japan. See id. at 1615-1618.

[8] For more detailed treatment, see 1 R. Rhoades & E. Steinberg, Income Taxation of Foreign Related Transactions 3-1 – 3-173 (1978); Comment, Tax Aspects of Doing Business Abroad—Subpart F Income, 17 DePaul L. Rev. 153 (1967).

more of the voting power of a controlled foreign corpora-
tion must include in gross income his "pro rata share" of
that corporation's Subpart F income in the taxable year.
This share is in turn defined as the amount "which would
have been distributed with respect to the stock which
such shareholder owns . . . if on the last day, in its taxable
year, . . . the [controlled foreign] corporation . . . had dis-
tributed pro rata to its shareholders" its Subpart F in-
come in that year. Code § 951 (text reproduced in the
margin[9]).

Subpart F income does not comprehend all the income
of the controlled foreign corporation. It consists of two
principal categories, income derived from the insurance
of United States risks and foreign base company income,
of which the latter is the more important. This latter is
composed of three major subcategories.[10] The first, for-
eign personal holding company income, comprises pas-
sive investment items such as royalties, dividends, inter-
est, and gains on the sale of investment assets. § 954(c).
The second, foreign base company sales income, is defined
as income derived by the controlled foreign corporation

---

[9] Code § 951: "(a) Amounts included. — (1) In general. — If a foreign
corporation is a controlled foreign corporation for an uninterrupted
period of 30 days or more during any taxable year, every person who
is a United States shareholder . . . shall include in his gross income,
for his taxable year in which or with which such taxable year of the
corporation ends—. . . (i) his pro rata share (determined under para-
graph (2)) of the corporation's subpart F income for such year . . . .
(2) Pro rata share of subpart F income. — The pro rata share . . . is the
amount — (A) which would have been distributed with respect to the
stock which such shareholder owns . . . in such corporation if on the
last day, in its taxable year, on which the corporation is a controlled
foreign corporation it had distributed pro rata to its shareholders an
amount (i) which bears the same ratio to its subpart F income for the
taxable year, as (ii) the part of such year during which the corporation
is a controlled foreign corporation bears to the entire year, reduced by
(B) the amount of distributions received by any other person during
such year as a dividend with respect to such stock . . . ."

[10] True as to Subpart F provisions applicable to 1969; the current
provisions include a fourth category, foreign base shipping income.
See Code § 954(f).

from the sale or purchase of personal property to, from, or on behalf of a "related person," that is, a shareholder owning more than 50% of the corporation's voting shares. § 954(d). The third, foreign base company services income, consists of income derived from the performance of technical, managerial, architectural, scientific, commercial, and other services undertaken outside the foreign corporation's place of incorporation for or on behalf of a related person. § 954(e). Subpart F income does not include ordinary income arising from the transaction of business with persons other than the 50% shareholders. In this way the relevant provisions are functionally related to the problem at which they are aimed, the use of foreign corporations to defer the payment of domestic tax.

(2) *Subpart F income as "income" within G. L. c. 63, § 30 (5) (a).* Dow cannot question that Subpart F income must be included in its gross income under the Federal Code, but contends that it need not be under Massachusetts law. We think the language of G. L. c. 63, § 30 (5) (a), is an impassable barrier to Dow: gross income is defined (we repeat) as "gross income ... under the provisions of the Federal Internal Revenue Code, as amended and in effect for the taxable year." This reflects a legislative intent, running through many State tax provisions,[11] to assure uniformity between State and Federal taxation. See *Daley* v. *State Tax Comm'n,* 376 Mass. 861, 863 (1978). Dow argues that, in the year in which it is reported, Subpart F income is not necessarily received by Dow or any other United States shareholder, although it is then earned by the foreign subsidiaries; therefore Dow may have received no benefit from the income and cannot be required to include it in Massachusetts gross income.

The effect of the argument would be to exclude, not merely Subpart F income, but, as well, dividends of that class actually received. As noted above, such received

---

[11] See, e.g., G. L. c. 62, §§ 1 (k), 2 (a); G. L. c. 63, § 1.

dividends are excluded from Massachusetts gross income because they are excluded from Federal gross income under Code § 959(a): Dow was permitted in 1969 to exclude from Federal and State gross income more than $10,000,000 of dividends received because these had been reported on both returns as current or previous Subpart F income when earned by the subsidiaries. If Subpart F income should not be included in gross income, as Dow contends, the result — reading the Federal provisions into the State law — would be to exclude from all State tax accountability a substantially identical amount of dividends actually received. (In its brief Dow concedes that the Subpart F income in 1969 not received by it that year "may be presumed to have been received subsequently.")

Dow's argument obscures the fact that the Subpart F provisions operate to prevent undesirable tax deferral. To that end it is entirely appropriate and lawful to treat Subpart F income as part of gross income. The taxpayer in *Estate of Whitlock* v. *Commissioner,* 494 F.2d 1297 (10th Cir.), cert. denied, 419 U.S. 839 (1974), contended that as an American shareholder it could not be compelled to include Subpart F income in gross income for Federal purposes: this, said the taxpayer, could not be considered income taxable under the Sixteenth Amendment. The court held against the taxpayer and "agree[d] fully" with the Tax Court's view that "undistributed current corporate income at the stockholder level" could properly be treated as income. *Estate of Whitlock* v. *Commissioner,* 59 T.C. 490, 507 (1972). Accord, *Garlock, Inc.* v. *Commissioner,* 489 F.2d 197, 202 (2d Cir. 1973), cert. denied, 417 U.S. 911 (1974); *Dougherty* v. *Commissioner,* 60 T.C. 917, 927-930 (1973). See Treasury Memorandum from Robert H. Knight to Secretary Dillon, Hearings on the President's 1961 Tax Recommendations Before the House Committee on Ways and Means, 87th Cong., 1st Sess., vol. 1, 313-322 (1961). See also *Eder* v. *Commissioner,* 138 F.2d 27 (2d Cir. 1943) (tax on undistributed net

income of foreign personal holding company under Code § 543). Compare *State Tax Comm'n* v. *Fitts*, 340 Mass. 575 (1960), where beneficiaries were taxed on dividends received by trustees but not distributed; we laid stress on the taxpayers' effective control of the trust.[12]

*Morville House, Inc.* v. *Commissioner of Corps. & Taxation*, 369 Mass. 928 (1976), is inapposite. There we rejected the Commissioner's claim that Federal "interest reduction payments" were to be included in gross income of the developers of a low-and-moderate income housing development undertaken pursuant to G. L. c. 121A. The payments were made by the Federal government to mortgagees of federally guaranteed mortgages on such projects, thus reducing the burden on the developers and attracting their initiative. Chapter 121A then contained no definition of gross income, but the Commissioner did not object to using the definition in G. L. c. 63, § 30 (5) (*a*), incorporating a general Federal definition (there was no provision addressed to the specific subject matter, as Code § 951 is trained at Subpart F income). We pointed out that "government subsidies generally are not considered as generating taxable income to the recipient of the economic benefit." *Id.* at 933. Further, the payments were made direct to the mortgagee and were part of a transaction

---

[12] See also *State Tax Comm'n* v. *New England Merchants Nat'l Bank*, 355 Mass. 417, 419-420 (1969); *Dewey* v. *State Tax Comm'n*, 346 Mass. 43, 47 (1963); *Helvering* v. *Estate of Enright*, 312 U.S. 636 (1941); *Heiner* v. *Mellon*, 304 U.S. 271 (1938); *Helvering* v. *City Bank Co.*, 296 U.S. 85 (1935); *Alvord* v. *Commissioner*, 277 F.2d 713 (4th Cir. 1960); *Marsman* v. *Commissioner*, 205 F.2d 335 (4th Cir. 1953). See the discussion in *Estate of Whitlock* v. *Commissioner*, 59 T.C. 490, 505-510 (1972). Cf. *Commissioner of Corps. & Taxation* v. *Thayer*, 314 Mass. 375, 377-379 (1943).

Dow does not suggest that its ownership of the foreign corporations on whose Subpart F income it has been assessed is insufficient to establish control. Dow refers to those corporations as its subsidiaries, and the record shows that by far the larger part of the foreign dividends received by Dow were from corporations of which it owned 80% or more of the voting shares.

between the mortgagee and the government; the developers assumed no personal liability to the mortgagee in case of default. It could not be said that the developers realized any "*present* material benefit equivalent to the receipt of income," *id.* at 935 (emphasis in original); they were merely "incidental beneficiaries of an accommodation worked out by the lender and the provider of the operating subsidy." *Id.* at 938.[13] The present case does not resemble *Morville House.*

(3) *Subpart F income as a dividend.* The Subpart F provisions of the Code describe a dividend which is deemed to have been distributed in the taxable year. Indeed, Subpart F income is included in gross income only because it is treated as a dividend. This is made plain by the text of Code § 951 quoted above: Subpart F income is the amount "which would have been distributed with respect to the stock," and so forth. Nonetheless, the Commissioner says Subpart F income should not be held a dividend deductible under G. L. c. 63, § 38, because that section, first, is limited to dividends of domestic corporations; second, cannot be read to cover a "deemed" distribution even if that same distribution is treated as income.

(i) General Laws c. 63, § 38 (*a*) (1), provides that "[d]ividends included therein [i.e., net income under the corporate excise as defined in § 30] shall be deducted" to obtain taxable net income.[14] By its terms the statute makes no

---

[13] Even so, we recognized in *Morville House.*(*id.* at 930 n.5) that our conclusion apparently conflicted with a certain ruling of the Internal Revenue Service treating the interest reduction payments as includible in gross income of a limited-profit association and deductible as interest paid or accrued on an indebtedness. Note, however, our citation of, and quotation from, *Commissioner* v. *First Security Bank*, 405 U.S. 394, 403 (1972); *Morville House, supra* at 930 n.5, 935.

[14] In 1969 the text of § 38 (*a*) (1) read in pertinent part, "The commissioner shall determine the part of the net income of a domestic business corporation or of a foreign corporation derived from business carried on within the commonwealth as follows: (*a*) Net income as defined in section thirty of this chapter adjusted as follows shall constitute taxable net income: (1) Dividends included therein shall be deducted." See St. 1966, c. 698, § 58.

distinction between foreign and domestic dividends. On the contrary, other provisions of c. 63 show a general disinclination to distinguish between corporations doing business in other States and corporations doing business in foreign countries; instead there is an assimilation of the two classes. See G. L. c. 63, § 30 (2) (defining "foreign corporation" to include both classes); G. L. c. 63, § 30(13) (defining "State" to include "any foreign country"). We should not follow the Commissioner's invitation to fabricate an exception to the text in the absence of "a most persuasive positive demonstration of legislative purpose." See *County Comm'rs of Norfolk County* v. *Norfolk County Retirement System*, 377 Mass. 696, 701 (1979).

The attempted demonstration by the Commissioner runs thus. The reason for the intercorporate dividend deduction is to prevent multiple taxation of corporate income. Without the deduction, three categories of taxpayers — the subsidiary corporation, the parent corporation, and the parent's shareholders — would each be subject to taxation on the same basic income. The State dividend deduction serves to ensure that the income may be taxed only to the original earner (the subsidiary) and the parent's shareholders. According to the Commissioner, this rationale is inapplicable when the subsidiary is incorporated in a foreign country. Neither the Federal Code nor the corporate excise statute purports to tax the foreign subsidiaries on their income; that income is taxed solely to its United States shareholders when distributed or so deemed. If foreign dividends were included in taxable net income of the parent — and held not to be deductible by it under G. L. c. 63, § 38 — the income, says the Commissioner, would still be taxed only twice, to the parent and the parent's shareholders. That result, she contends, would not subvert the statutory purpose of preventing undue multiple taxation of corporate income. The Commissioner notes, further, that the Federal divi-

dend deduction in Code § 243 is expressly limited to divi-
dends from domestic corporations and urges that her
proffered interpretation would promote uniformity be-
tween the two statutes.

The Commissioner's proposal, besides offending
against the statutory text, appears to proceed on a misun-
derstanding of the relationship between the corporate
excise and the Internal Revenue Code. Foreign subsidiar-
ies are in fact subject to tax in the countries in which they
are incorporated. The corporate excise, by allowing a de-
duction for dividends from these subsidiaries and thus
preventing the possibility of triple taxation, performs the
same general function in the State scheme as does the
foreign tax credit in the Federal scheme.[15] We have no
warrant for destroying this symmetry by arbitrarily rul-
ing foreign dividends out of the dividends category al-
together.

(ii) The corporate excise statute provides no definition
of "dividend"[16] and we have some liberty to follow the
reason of the thing.

The Commissioner observes that Code § 316(a) defines
dividend generally as a distribution out of earnings and
profits, and that Subpart F income is not such a distribu-
tion. The Subpart F provisions of the Code do not express-
ly use the term "dividend" to describe the amount to be

---

[15] See note 30, *infra*. It remains the case that the dividend deduction
is less inclusive than the foreign tax credit because it does not encom-
pass income from foreign branches. Contrary to the Commissioner's
contention, however, the resulting distinction between foreign sub-
sidiary and foreign branch income is not an anomaly, but a natural
product of the State system which provides a deduction for dividends
and not for foreign taxes paid.

[16] However, the personal income tax defines "dividend" as "any
item of federal gross income which is a dividend under section three
hundred and sixteen of the Code or which is treated as a dividend
under any other provision of the Code." G. L. c. 62, § 1 (*e*), as appearing
in St. 1973, c. 723, § 16. Acceptance of the Commissioner's view that
items "treated as a dividend" are not dividends would thus result in
a disparity in the definitions of dividend in c. 62 and c. 63.

distributed. Moreover, Subpart F income lacks certain usual characteristics of a dividend found in our cases: it has not necessarily been distributed from the foreign corporation's earnings or profits, *Williston* v. *Michigan S. & N. Ind. R.R.*, 13 Allen 400, 404 (1866), or voted upon by any board of directors, *Willson* v. *Laconia Car Co.*, 275 Mass. 435, 441 (1931); it has not necessarily reduced the capital value of the foreign corporation, *Boston Safe Deposit & Trust Co.* v. *Commissioner of Corps. & Taxation*, 273 Mass. 187, 200 (1930). The Commissioner concludes that Subpart F income, as a "deemed" distribution, should not be treated as a dividend deductible under G. L. c. 63, § 38 (*a*).

We return, however, to the proposition that the Subpart F device is aimed at the problem of tax deferral. Functionally it accelerates the recognition of earned income as dividends.[17] In the legislative history, Subpart F income is described as a dividend to the United States shareholders,[18] and it is on this basis that it is included in gross income. Other provisions of the Code conform to this understanding. Under § 952(c), Subpart F income

[17] Some portion of Subpart F income possibly may not be distributed until a considerable time after it is included in income. But the control exercised over Subpart F income by a parent corporation such as Dow is sufficient in the circumstances to permit taxation even if repatriation will not occur at all.

[18] See, e.g., Hearings on the President's 1961 Tax Recommendations Before the House Committee on Ways and Means, 87th Cong., 1st Sess., vol. 1, 260 (1961) ("Under the [President's] recommendation ... the annual undistributed profits of any foreign corporation ... would be deemed distributed as a dividend to American shareholders") (Detailed Explanation of the President's Recommendations Contained in His Message on Taxation, submitted by Secretary Dillon); *id.* at 313 (President's recommendations would "require each shareholder ... to include in gross income, as a dividend, that shareholder's proportionate share") (Treasury Memorandum from Robert H. Knight to Secretary Dillon). See also Park, Fiscal Jurisdiction and Accrual Basis Taxation: Lifting the Corporate Veil to Tax Foreign Company Profits, 78 Colum. L. Rev. 1609, 1614 (1978) ("Income of a controlled foreign corporation, whether distributed to its shareholders or not, will be taxed as a dividend ...").

may not exceed "the earnings and profits" of the foreign corporation in the taxable year. The amount of Subpart F income must, under § 951(a)(2)(B), be reduced by actual dividend distributions received by any person, other than the taxpayer, who had owned the taxpayer's stock during some part of the taxable year. And the foreign tax credit provisions, applicable to actual dividends, are applied in similar form to Subpart F income. § 960.

To accept the Commissioner's contention would indeed have the effect of destroying the purpose of the dividend deduction of G. L. c. 63, § 38(a). A deduction may be taken only for dividends included in net income in the taxable year. If a deduction for Subpart F income were to be disallowed, the consequence would be to prohibit a deduction for that income even when distributed. For dividends actually received — but excluded from net income because comprised in Subpart F income reported in current or previous years — are not included in Federal income, thus are also excluded from State income, and hence could not be deducted therefrom. (The point is exemplified by the more than $10,000,000 in dividends actually received by Dow in 1969.) The Commissioner's position would simply reinstate the multiple taxation intended by the State scheme to be eliminated.[19]

---

[19] See Dane, Taxation of Corporations and Banks: 1966 Legislation, 52 Mass. L.Q. 41, 57 (1967): "The rationale for including Subpart F income in gross income for federal tax purposes is that it is for all practical purposes the equivalent of a dividend from the foreign subsidiary. Since ... intercorporate dividends are not taxable under the 1966 amendment to the corporation excise tax, a similar exemption should be granted to Subpart F income." See also note 31, infra, second paragraph.

The Commissioner seeks to support her interpretation with a 1966 advisory letter from one of her tax counsel to the effect that Subpart F income could not be deducted as a dividend. This letter, however, hardly establishes an administrative practice entitled to deference, and Dow challenged the interpretation as early as 1969. We may note in addition that the record suggests that the Commissioner has allowed a deduction for dividends from foreign corporations (other than Subpart F income), and thus the Commissioner's broad argument that

The view we take accords with *Commonwealth* v. *Emhart Corp.*, 443 Pa. 397 (1970), cert. denied, 404 U.S. 981 (1971), the only case cited in which the issue has been raised. There the taxpayer sought to deduct Subpart F income under a statutory provision authorizing a deduction for "dividends received from any other corporation." Pa. Stat. Ann. tit. 72, § 3420b 1(b) (Purdon 1964). The Commonwealth of Pennsylvania contended that the deduction should be limited to dividends "received" and should not embrace deemed distributions not actually received by the taxpayer. In *Emhart*, as here, intercorporate dividends could not be deducted unless they were included in Federal gross income. The court noted that "if a corporation fails to take the deduction in the year it included the dividend in its federal return, it is unclear whether the corporation can ever take advantage of the deduction in a later year, for while the corporation will have 'received' the dividend, it will not have included that sum in its federal return — a prerequisite for the [State] deduction." *Id.* at 408. The court found that failure to permit the deduction for Subpart F income could not be reconciled with the "clear legislative determination that a corporation at some point is entitled to a deduction for dividends received from other corporations, presumably to avoid a double tax at the corporate level." *Id.*

To conclude, although the Commissioner properly required inclusion of Subpart F income in gross income, she erred in failing to allow a deduction under G. L. c. 63, § 38 (*a*) (1).[20]

---

such dividends are not deductible is apparently contradicted by the administrative practice.

[20] The State tax consequences to Dow would be the same whether Subpart F income were held not income, or income but subject to deduction as dividend. It is thought important to deal with the question whether it is income in order, first, to conform to the analytics of the tax system, and, second, to make it clear that no constitutional limit is approached (so long as taxable net income is fairly apportioned, see notes 5 & 6, *supra*) and the matter remains subject to legislative treatment.

C. *Foreign tax gross-up*. (1) *Description*. Under the Federal Code, domestic corporations are taxed on their world-wide income. They are also subject to tax by every other country in which they do business. To ease the resulting burden on international investment, the Code allows United States citizens and corporations paying income, war profits, or excess profits taxes in foreign countries to choose to take a "foreign tax credit" against Federal tax in the amount of foreign taxes paid or accrued in the taxable year.[21] This operates as a dollar-for-dollar reduction of the domestic tax.

Where § 901 provides a credit for foreign taxes actually paid by a domestic taxpayer, § 902 goes on to allow a credit for foreign taxes paid or deemed paid by a foreign corporation of which any domestic corporate taxpayer owns at least 10% of the voting stock. The rationale for the "indirect" credit is that this shareholder has effectively paid — and is therefore "deemed to have paid," § 902(a) — the foreign tax through a reduction in the foreign income available for repatriation in the form of dividends. See E. Owens & G. Ball, The Indirect Credit 3-6 (1975).

Figuring the amount of the indirect credit has its difficulties. For example, if a foreign corporation, in respect of $100 earned in before-tax accumulated profits, paid $40 in local tax, and distributed $60 as a dividend to its domestic parent, it would be thought excessively generous or lenient to permit the parent to take all of the $40 as a credit. So the Supreme Court decided in *American Chicle Co.* v. *United States*, 316 U.S. 450 (1942), and interpreted § 902 to require the parent to compute the indirect credit by multiplying the foreign taxes paid by a fraction consisting of dividends received, divided by accumulated profits (defined in § 902[c][1] as total income without re-

---

[21] The foreign tax credit was first enacted by Revenue Act of 1918, c. 18, § 222, 40 Stat. 1073, 1080 (1919).

duction for foreign or domestic taxes) — in the example stated, $40 \times \$60/\$100 = \$24$.

This situation bred further difficulties. If the foreign tax rate was lower than the United States rate, the *American Chicle* rule could be thought to overcompensate the domestic shareholder by producing an over-all tax rate lower than the United States tax rate. See E. Owens, The Foreign Tax Credit 113-118 (1961). The rule was also thought unreasonably to favor corporations using foreign subsidiaries over those with foreign branches.[22] To remedy the situation, Congress in 1962 enacted the "foreign tax gross-up." Under the new § 78 (quoted in the margin),[23] a fraction of the taxes paid or deemed paid by the foreign subsidiary must be included "as a dividend" in the gross income of the domestic taxpayer electing to take the foreign tax credit. The fraction (set forth in § 902) consists, in the numerator, of the dividends actually received by the taxpayer, and, in the denominator, of so much of the foreign corporation's accumulated profits as exceeds the foreign tax. The effect of the gross-up provision in the example given would be, first, to require the domestic parent to include $100 as income and, second, to permit it to take the full $40 as a foreign tax

[22] The foreign branch income would have to be included in the income of the domestic corporation. So, to use the example given in the text, a corporation operating with a foreign branch would include $100 in domestic income and take a credit of $40. If the domestic tax rate was 50%, that corporation would pay a total tax of $50 ($40 to the foreign government and $50 − $40 = $10 domestically), whereas the corporation with the foreign subsidiary would pay $46 ($40 to the foreign government and $30 − $24 = $6 domestically).

[23] The text of § 78 reads, "If a domestic corporation chooses to have the benefits of subpart A of part III of subchapter N (relating to foreign tax credit) for any taxable year, an amount equal to the taxes deemed to be paid by such corporation under section 902(a) (relating to credit for corporate stockholder in foreign corporation) or under section 960(a)(1) (relating to taxes paid by foreign corporation) for such taxable year shall be treated for purposes of this title (other than section 245) as a dividend received by such domestic corporation from the foreign corporation."

credit. The $40 added to the actual dividend distribution of $60 represents the foreign tax gross-up.

Under § 960 of the Code, the same ideas are used to enable a domestic shareholder to take an indirect credit for foreign taxes deemed paid on undistributed Subpart F income. In calculating the credit under § 960, the Subpart F income included in gross income is "grossed-up" — fictionally increased — by the foreign taxes deemed paid. In the present case, the $411,256 that Dow reported as foreign tax gross-up represents the amount of taxes paid or deemed paid by its foreign subsidiaries on the $8,539,-158 included as Subpart F income. But, having included that amount in gross income, Dow was permitted under § 960 to take the same amount[24] as its credit against Federal tax.

(2) *Treatment of foreign tax gross-up under G. L. c. 63, §§ 30 (5) (a) and 38 (a) (1).* We turn to the State law. Dow's contention that the foreign tax gross-up may not be considered as income proceeds on the general proposition, not in dispute, that in order to be taxable as income an item must represent some benefit or accretion of wealth which may be fairly imputed to the taxpayer.[25] Dow maintains that, unlike Subpart F income, the gross-up is not income to Dow's foreign subsidiaries; and it is not income to Dow. Indeed, in some circumstances the effect of the gross-up provision may be to require a domestic parent to

---

[24] The gross-up may in some situations be somewhat higher than the amount of the foreign tax credit: the gross-up is the total of the deemed paid tax, whereas Code § 904 provides that the amount of the credit for that deemed-paid tax may not exceed the amount obtained by multiplying the United States tax rate by the taxable income from sources outside the United States. See 2 R. Rhoades & L. Steinberg, *supra* at 5-141 − 5-142. In certain circumstances the section 904 limitation in increased for Subpart F income. See Code § 960(b).

[25] See *Morville House, Inc.* v. *Commissioner of Corps. & Taxation,* 369 Mass. 928, 935-936 (1976); Surrey & Warren, The Income Tax Project of the American Law Institute: Gross Income, Deductions, Accounting, Gains and Losses, Cancellation of Indebtedness, 66 Harv. L. Rev. 761, 769-775 (1953).

include in Federal income, as the deemed income of its foreign subsidiary, an amount greater than the accumulated profits of that subsidiary.[26] Dow asserts that the gross-up is only an arithmetic procedure that may not be treated as taxable income — unless accompanied by the foreign tax credit whose proper calculation it is designed to assure and from which, according to Dow, it cannot be separated.

The Commissioner's chief response is that the indirect foreign tax credit on Subpart F income is in fact a benefit to Dow. The benefit takes the form of a reduction in Dow's Federal tax liability, and this reduction, the Commissioner suggests, may be treated as taxable income under G. L. c. 63, § 30 (5) (a). The Commissioner observes that in *F. W. Woolworth Co.* v. *Commissioner of Taxes*, 130 Vt. 544 (1972), the Vermont Supreme Court seems to have accepted this view. It is instructive to note that the Vermont court went on to hold that if the gross-up was to be included in income — and Vermont law did not allow a corrective deduction for dividends — the apportionment formula applied to the taxpayer must be modified. *Id.* at 556-557. As the court explained in a later opinion, the modification was required in order to prevent "an arbitrary and unfair representation of the 'extent of the business activities of a corporation within this state.' " *F. W. Woolworth Co.* v. *Commissioner of Taxes*, 133 Vt. 93, 98 (1974).[27] In 1971 the Vermont Legislature had acted to

---

[26] This anomaly may result, for example, when a foreign subsidiary's income consists solely of Subpart F income: if the subsidiary earns $100 in Subpart F income and pays a tax of $40 to the foreign country, the domestic parent will include $140 in its gross income.

[27] In the 1974 *Woolworth* case the court upheld a "new formula includ[ing] the property, wages, and sales of Woolworth's foreign subsidiaries as factors to allocate a fair and equitable portion of the 'gross-up' item of Woolworth's taxable income." 133 Vt. at 96. Justice Larrow, who was not on the court in the 1972 *Woolworth* case, dissented from the 1974 *Woolworth* case and from *In re Goodyear Tire & Rubber Co.*, 133 Vt. 132 (1975) (reaffirming the two *Woolworth* decisions), on the ground that gross-up did not represent a gain or benefit

exclude gross-up from taxable income for the future. 1971 Vt. Acts, c. 73, § 12, amending Vt. Stat. Ann. tit. 32, § 5811(18).

We must ask whether the logic of the Commissioner's argument would not extend to permit State taxation of all the various diminishments of Federal tax liability derived from credits or deductions granted by the Federal Code. But such reductions do not conform to conceptions of taxable income.[28] We need not, however, attempt to deal with the large and pervasive issues suggested by the Commissioner's thesis. For it seems the Commissioner seizes on the foreign tax credit and calls that "income" in order to distract attention from the fact that the gross-up involves at least an hypothesized dividend which may be deductible under State law.

The gross-up-foreign tax credit symbiosis is a means of calculating a suitable Federal tax credit for the United States parent and in truth it is a strain to deal with any part of it as "income" for State purposes. However, we must be faithful to the corporate excise which incorporates the Federal definition of gross income, and that comprehends the gross-up. The gross-up is expressly assimilated by Federal law to a dividend: "[A]n amount equal to the taxes deemed to be paid . . . shall be treated . . . as a dividend received by such domestic corporation from the foreign corporation." § 78. We think it retains its character as a dividend under the State law and becomes deductible as such.[29] In a sense, the State divi-

---

to the taxpayer and should therefore be excluded from Vermont net income.

[28] We pass over the point that characterization as income of a Federal tax advantage resulting from the foreign tax credit, and assessing State tax on such "income," might be thought to work against the Federal encouragement of international investment. Cf. *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U.S. 434 (1979).

[29] We are not called upon to say whether any different considerations could be held to apply when the gross-up is on regular dividend income rather than Subpart F income.

dend deduction serves a function regarding the gross-up comparable to that supplied by the Federal foreign tax credit although the dollar incidences to the taxpayer may vary.[30]

The Commissioner protests the allowance of the deduction because it would, in her view, subvert the legislative purpose of G. L. c. 63, § 30 (5) (*b*) (iii), which disallows deductions for "taxes . . . imposed by any state" (read to include foreign country, § 30 [13]). But there is a fundamental difference between allowing a deduction for gross-up and allowing a deduction for taxes paid to other States. Unlike the State taxes, the gross-up is deemed a dividend and therefore included in gross income as an additional item of income. Allowing a deduction for gross-up has the effect of off-setting the inclusion of foreign taxes as an additional item of income, not of permitting a deduction of foreign taxes from gross income normally computed. If a corporation doing business in the Commonwealth earns $100 in another State of the union and pays $40 in taxes to that State, the effect of G. L. c. 63, § 30 (5) (*b*) (iii), will be to require the corporation to include $100 in taxable income subject to apportionment and to disallow a deduction for the $40 in taxes paid. By contrast, if the corporation has a foreign subsidiary with $100 in Subpart F income, and pays $40 in foreign tax on that income, the consequence of the Commissioner's position with respect to the gross-up would be to require the corporation to include $140 in income and to disallow a deduction for the $40 added to the $100 actually earned.

---

[30] Variations may occur because the Massachusetts system allows a deduction for foreign dividends (including the gross-up and Subpart F income), whereas the Federal Code taxes those dividends but allows a credit for foreign taxes deemed paid thereon. In some situations — depending on the foreign and Federal rates of tax — the Federal credit may not entirely offset the Federal tax on foreign dividends included in taxable income. See Park, Fiscal Jurisdiction and Accrual Basis Taxation: Lifting the Corporate Veil to Tax Foreign Company Profits, 78 Colum. L. Rev. 1609, 1619 & n.64 (1978).

The purpose of G. L. c. 63, § 30(5)(*b*)(iii), is to prohibit deduction of $40 from the $100 of gross income as ordinarily conceived, not of that amount when it has been added to gross income "as a dividend."

On another tack, the Commissioner complains that it is merely fictional to speak of the gross-up as a dividend, and the State should not so regard it. But the inclusion of the gross-up as income under State law is based on the Federal fiction. The Commissioner is adopting the fiction for purposes of inclusion but seeks to reject it for purposes of exclusion, thus taxing as income an item included as such only because it helps to assure proper computation of a credit disallowed by State law. We cannot accept the Commissioner's reasoning or result.

Our conclusion that the foreign tax gross-up is deductible as a dividend accords with *Commonwealth* v. *Emhart Corp.*, *supra*, and with *Getty Oil Co.* v. *Director of Revenue*, 1 CCH Del. Tax Rept. par. 200-286 (Del. Tax App. Bd. 1975), where the gross-up was held within a State statute allowing a deduction for "[d]ividends received ... on shares of stock for which foreign tax credit is provided under the applicable provisions" of the Code, the Board stating that "the words 'dividend received' mean, for the purpose here, 'dividend deemed to have been received.'"[31]

---

[31] See also Md. Ann. Code art. 81, § 280A(c)(4), inserted by 1977 Md. Laws, c. 812 (excluding the foreign tax gross-up from taxable income); S. Rep. No. 1881 to H.R. 10650, 87th Cong., 2d Sess. 227 (1962) ("a section 78 dividend is included in gross income under section 61 [a] [7]").

There is some additional support for our conclusion in the provision of G. L. c. 63, § 38 (*a*) (1) (*ii*), as appearing in St. 1974, c. 722, § 1, which excludes from the category of deductible dividends "deemed distributions and actual distributions, except actual distributions out of previously taxed income, from a DISC [Domestic International Sales Corporation] which is not a wholly-owned DISC." Like the gross-up, undistributed income of a DISC is taxed "as a dividend" by Code § 995 (b) (1). If deemed dividends were already excluded from the category

D. *Deduction for dividends previously included in Sub-part F income but actually received in 1969.* What was said at B above suffices to dispose of Dow's contention that it properly deducted the $3,740,485 actually received in 1969 but included in Subpart F income in previous years. The dividend deduction of G. L. c. 63, § 38 (*a*) (1), is confined to dividends included in taxable net income for the year in which the deduction is claimed. The Commissioner properly disallowed the claimed deduction.

The disposition will be as indicated in II above. The case is remanded to the Commissioner of Revenue for computation of the proper amount of the abatement owed to Dow for the erroneous inclusion of Subpart F income and foreign tax gross-up in taxable net income subject to apportionment.[32]

*So ordered.*

---

of deductible dividends, it would be unnecessary expressly to exclude them by § 38 (*a*) (1) (*ii*).

[32] The court allowed a motion by Polaroid Corporation to file a brief amicus on the side of the plaintiff in the present case.